AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

UNITED STATES DISTRICT COURT

for the

Central District of California





| | |
|---|---|
| United States of America | |
| Plaintiff | |
| v. | Case No.  8:22-mj-00402-DUTY |
| ROEL ERNESTO BOJORQUEZ-GASTELLUM, | |
| Defendant(s) | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date of May 7, 2022, in the county of Orange in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 2 | Distribution of a Controlled Substance |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Jared Blevens*
*Complainant's signature*

Jared Blevens,
Special Agent, Drug Enforcement Administration
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  ____June 1, 2022____

_____
*Judge's signature*

City and state:  ___Los Angeles, California___

___Hon. Karen L. Stevenson, U.S. Magistrate Judge___
*Printed name and title*

AUSA: Rachel N. Agress (x0487)

## AFFIDAVIT

I, Jared Blevens, being duly sworn, declare and state as
follows:

### I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal
complaint and arrest warrant against ROEL ERNESTO BOJORQUEZ-
GASTELLUM ("BOJORQUEZ") for a violation of 21 U.S.C.
§ 841(a)(1): Distribution of a Controlled Substance.

2.    This affidavit is also made in support of an
applications for a warrant to search the person of BOJORQUEZ, as
described further in Attachment A.

3.    The requested search warrant seeks authorization to
seize evidence, fruits, or instrumentalities of violations of 21
U.S.C. § 841(a)(1) (distribution of, and possession with intent
to distribute, controlled substances) and 21 U.S.C. § 846
(conspiracy and attempt to distribute controlled substances)
(the "Subject Offenses"), as described more fully in Attachment
B.  Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrant, and search warrant, and does not purport to set forth
all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and

statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).  I am empowered to conduct investigations of, and to make arrests for, federal felony offenses enumerated in 18 U.S.C. § 2516.

6.    I am a Special Agent ("SA") of the Drug Enforcement Administration ("DEA") and have been so employed since January 2020.  I am currently assigned to the Los Angeles Field Division ("LAFD"), Riverside District Office ("RDO"), in Riverside, California, and my responsibilities include investigating large-scale drug trafficking organizations operating in the Southern California area and elsewhere.

7.    During the course of my employment, I have received approximately 300 hours of specialized training at the DEA Academy in Quantico, Virginia, on drug identification, detection, and interdiction, money laundering techniques, conspiracy investigations, and asset identification, seizure, and forfeiture.  During the academy, I was also trained on wire and electronic interceptions and the use of wire and electronic interception equipment.  I am certified by the California State Attorney General's Office in the practical, technical, and legal aspects of court-ordered wiretaps per California Penal Code Section 629 et seq.

8.    I have participated in numerous drug investigations, which have included the use of confidential sources and

undercover officers, physical surveillance, electronic surveillance, the execution of search and arrest warrants, dialed number recorders (pen registers), telephone toll analysis, the arrests of drug traffickers, and the analysis of seized records, physical evidence, and taped conversations. Over the course of my employment as a law enforcement officer, I have participated in investigations that involve one or all of the following crimes: possession, distribution, possession with intent to distribute, and manufacture of controlled substances. I have assisted in the execution of multiple search warrants and have spoken with defendants, confidential informants, and other witnesses who have extensive knowledge of large-scale narcotics trafficking organizations.  In addition, I have spoken with other experienced narcotics investigators concerning the methods and practices of drug traffickers.  I have also reviewed electronically intercepted communications and consulted with other law enforcement and legal personnel regarding the legal bases for the application and use of wire interceptions.

9.    Based on my training and experience, my conversations with other law enforcement personnel, and my own participation in this investigation, I have become familiar with the criminal activities of individuals involved in drug trafficking organizations, including drug manufacturing, drug distribution, and money laundering.  I am also aware of the tactics and methods employed by such individuals to avoid detection by law enforcement, including the use of multiple wireless telephones, pre-paid cellular telephones, cloned communication devices,

debit calling cards, public pay telephones, counter-surveillance techniques, false or fictitious identities, coded and ambiguous language in conversations, multiple vehicles, and vehicles with concealed compartments. I am aware that drug traffickers drop or switch telephones and/or telephone numbers frequently to thwart law enforcement investigation of their criminal activities. I am further aware that drug traffickers use wireless telephones subscribed in the names of other individuals, often times their spouses or other family members, to avoid law enforcement detection. Based on my training and experience, I have found that it is common for narcotics traffickers to obtain, maintain, and use firearms in order to protect their narcotics and narcotics proceeds and that the cell phones they use have high call volume from a variety of telephone numbers.

### III. **SUMMARY OF PROBABLE CAUSE**

10. During the course of this investigation, BOJORQUEZ has been identified as a large-scale narcotics dealer who lives in Mexico but who travels to the Los Angeles, California area where he has a drug distribution network.

11. In March and April 2022, a confidential source ("CS-2")[1] communicated with BOJORQUEZ about narcotics sales.

---

[1] CS-2 is a paid DEA informant and has worked for DEA intermittently from 2014 to present. Throughout his/her tenure as a confidential informant, CS-2 has provided information that has been corroborated and proven to be accurate. While working as a confidential source for local law enforcement, CS-2 provided information for investigations that have led to the arrests and conviction of several targets. CS-2 has the
*(footnote cont'd on next page)*

Specifically, CS-2 informed BOJORQUEZ that he/she has a criminal associate who is interested in purchasing narcotics, and BOJORQUEZ provided CS-2 with three narcotics samples (suspected heroin and fentanyl) on or about April 7, 2022 to provide to CS-2's associate.

12.  In April and May 2022, CS-2 continued to communicate with BOJORQUEZ about narcotics sales, and BOJORQUEZ agreed to sell CS-2's "associate" one kilogram of heroin for $14,500.

13.  On or about May 7, 2022, BOJORQUEZ provided CS-2 with two kilograms of suspected black tar heroin and one kilogram of suspected counterfeit Oxycodone pills, and asked CS-2 to hold on to the residual narcotics for him while he returned to Mexico and for CS-2 to provide one of the kilograms of black tar heroin to his/her associate. On a later call, CS-2 told BOJORQUEZ that his associate took the residual narcotics and would compensate BOJORQUEZ.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

14.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

---

following prior criminal felony convictions:  a felony conviction for possession of narcotics for sale in 1995, a felony conviction for accessory to murder in June 2006, and a felony conviction for alien smuggling in October 2010.  As of 2021, CS-2 was not active due to safety concerns and lack of investigative leads.  CS-2 was reactivated in connection with the information provided relating to this target in or around October 2021.

### A.  Anthony Chavez, A Narcotics Dealer, Introduces A Confidential Source (CS-1) To His Supplier, BOJORQUEZ

15.  In or around July 2021, a Confidential Source ("CS-1")[2] provided DEA agents with information about a large-scale narcotics dealer of counterfeit Oxycodone and cocaine (who was later identified as Anthony Chavez ("Chavez")), including screenshots of narcotics-related conversations with Chavez relating to pricing and pictures of narcotics.[3]

16.  On or about July 19, 2021, CS-1 provided DEA with a recording of a Facetime conversation with Chavez.  The video did not have sound, but CS-1 informed DEA that on the video, Chavez connected CS-1 with one of his "plugs" for cocaine, which, based on my training and experience is slang for a source of supply for narcotics.  In the video, Chavez displays an item which I recognized from my training and experience as a kilogram brick of cocaine.  A Hispanic male then comes onto the screen and appears to be conversing with CS-1.

---

[2] CS-1 is currently signed up as a confidential source with an out-of-state local law enforcement agency.  CS-1 began working with local law enforcement in approximately 2021 in connection with an ongoing state investigation into narcotics-related conduct by CS-1. CS-1 has not been convicted in that state investigation.  CS-1 has been in contact with the DEA since July 2021.  CS-1 has provided information that has been corroborated and proven to be accurate.  While working as a confidential source for local law enforcement, CS-1 provided information for investigations that have led to the arrests and convictions of several targets.  CS-1 has the following prior criminal convictions from 2010: a felony conviction for conspiracy to distribute cocaine, a felony conviction for robbery of government property, and a felony conviction for brandishing a firearm during a crime of violence.

[3] CHAVEZ was federally indicted in August 2021 in the Central District of California on charges relating to fentanyl distribution in Case No. CR 21-404-SB.

### B.    Identification Of Roel Ernesto BOJORQUEZ-GASTELUM

17. U.S. Customs & Border Protection ("CBP") ran facial recognition software on a screenshot of the Hispanic male's face in the FaceTime video and returned a match to "Roel Ernesto Bojorquez Gastelum" (BOJORQUEZ), with a date of birth and birthplace of Sinaloa, Mexico.  I independently reviewed the Facetime screenshot and a comparison photo of BOJORQUEZ provided by CBP, and confirmed that BOJORQUEZ is identifiable as a match.

### C.    Law Enforcement Find Further Communications Identifying BOJORQUEZ As A Narcotics Supplier On Chavez's Phones

18. On August 12, 2021, DEA agents executed a federal search warrant at Chavez's apartment.[4]  During the execution of the search warrant, CHAVEZ and two others were arrested while DEA seized approximately 4,358 grams of counterfeit pills; 1,100 grams of powder fentanyl; 536 grams of methamphetamine; 63 grams of cocaine; $18,900 U.S. Currency; and eight cellular telephones.

19. From the seized telephones that were determined to belong to Chavez, extracted data revealed hundreds of Telegram and WhatsApp communications between Chavez and an individual saved in the phone under a name indicated herein as "C.Y." including narcotics-related messages in Spanish and English.

20. On or about July 14, 2021, Chavez sent C.Y. a photograph of a white powdery substance and a message in Spanish

---

[4] Search Warrant signed on August 10, 2021, by the Honorable Shashi H. Kewalramani, United States Magistrate Judge, Central District of California, Order No. 5:21-MJ-00521.

translated to mean "It has to be like this." [5]  C.Y. replied,
"Ok.  Hey the artists are really good.  They don't have
pictures.  If you want you can check them out at the homeboy's
office."  On July 15, 2021, Chavez replied, "Ok. Give me the
number.  For the artist."  I understood these messages to mean
that Chavez wanted any narcotics to be of the same quality as
the narcotics in the photograph, with C.Y. replying that the
narcotics dealer would not send pictures and Chavez would have
to reach out to the narcotic dealer to examine the drugs in
person.

    21.  On the same date, C.Y. sent Chavez a digital contact
file with the name "Roel," with a phone number ending in 8837
("8837 number").  A subpoena sent to the cellular provider for
subscriber information on the 8837 number returned what appeared
to be a fictitious name at a fictitious address.  In my training
and experience, drug traffickers often subscribe phones under
fictitious names and addresses in order to avoid detection and
identification by law enforcement.

    22.  Also on or about July 15, 2021, C.Y. sent Chavez a
photograph of an off-white rectangular brick object with a
swastika impression (appeared to be pressed/stamped) on the
center of the brick.  Based upon the shape and the coloring, as
well as the impression/stamp, I know this to be consistent in

---

[5] Unless otherwise stated, all conversations, phone calls
and messages in this affidavit between targets, subjects and
confidential sources are in Spanish.  I understand Spanish and
provide English summaries for purposes of this affidavit.

the manner of that kilograms of cocaine and fentanyl are manufactured, transported, and distributed.

23.  On or about July 16, 2021, C.Y. sent Chavez a photograph of a telephone number labeled "Junior New" with a phone number ending in 2993 ("2993 number") and a subsequent text message that read "Part of the color," followed by a voice message, "this is to reach the artist."  On the same date, Chavez replied to C.Y. in a voice message stating "I am on it." A subpoena sent to the cellular provider for subscriber information on the 2993 number returned what appeared to be a fictitious name at a fictitious address.  In my training and experience, drug traffickers often subscribe phones under fictitious names and addresses in order to avoid detection and identification by law enforcement.

### D.    A Second Confidential Source Arranges To Meet with BOJORQUEZ To View A Sample of Narcotics For Sale

24.  In or about October 2021, DEA identified that a second Confidential Source (CS-2), had previously provided BOJORQUEZ's name as a large-scale narcotics dealer.[6]  CS-2 reported being a drug-trafficking associate of BOJORQUEZ's as early as 2014, prior to becoming a confidential source.  During that time, BOJORQUEZ frequently used CS-2 to transport bulk U.S. Currency/narcotics proceeds.  CS-2 also informed law enforcement that he/she previously had a relationship of a romantic nature with BOJORQUEZ around 2014.

---

[6] CS-2 also was shown the screenshot taken during the Facetime call with Chavez in July 2021, as well as the comparison photo of BOJORQUEZ provided by CBP, and confirmed that the individual in both is BOJORQUEZ.

25. At the direction of DEA, on or about February 27, 2022, CS-2 visited a residence in Los Angeles, California that he/she knew to have previously been associated with BOJORQUEZ. CS-2 told the unidentified male who answered the door that CS-2 wanted to get in contact with BOJORQUEZ and provided CS-2's phone number.

26. The next day, CS-2 received a recorded phone call from a Mexico-based telephone number.[7]  CS-2 recognized the caller's voice as BOJORQUEZ.  On the call, BOJORQUEZ informed CS-2 that he was currently in Mexico.  CS-2 informed BOJORQUEZ that he/she wanted to talk about other things, referring to narcotics transactions.

27. On or about March 18, 2022, DEA directed CS-2 to contact BOJORQUEZ on the Mexico-based telephone number. BOJORQUEZ informed CS-2 that he was currently in Tijuana, Mexico, but planned to travel to the United States with a relative on March 26, 2022.  BOJORQUEZ confirmed that he would reach out to CS-2 when he arrived in the United States.

28. CS-2 informed DEA that based on his/her previous experience dealing with BOJORQUEZ, BOJORQUEZ waits in Tijuana until a narcotics load is ready to cross the border into the United States.  BOJORQUEZ then escorts the load across the border and oversees its distribution.

29. On or about March 31, 2022, BOJORQUEZ arrived at CS-2's place of employment in Los Angeles without prior notice.

---

[7] Unless otherwise stated, all calls and text/messaging communications referenced in this affidavit between CS-2 and BOJORQUEZ were recorded.

This was the same place of employment that CS-2 had previously worked at when he/she was an associate of BOJORQUEZ in the past. In addition, on the prior phone call with BOJORQUEZ, CS-2 mentioned that he/she was still in the same line of work.  Given the unexpected nature of the encounter, the conversation was not recorded, but the substance of the conversation was later relayed to DEA by CS-2.

    30.  During that meeting, BOJORQUEZ told CS-2 that he was planning to travel to Mexico on April 1, 2022 and return to the United States on an unspecified date with approximately 30,000 counterfeit Oxycodone pills.  CS-2 informed BOJORQUEZ that he/she has a criminal associate who is interested in purchasing narcotics.  BOJORQUEZ told CS-2 that he would provide samples of "china white" heroin, black tar heroin, and counterfeit Oxycodone pills for CS-2's associate upon his return from Mexico.  Based on my training and experience, "china white" refers to white powder fentanyl.  CS-2 understood that BOJORQUEZ planned to call or send a text message to him/her from BOJORQUEZ's new U.S.-based number.  Later in the evening of March 31, 2022, CS-2 received a text message from a telephone number ending in 7211 ("7211 number") in Spanish, translated to mean "this is my number."

    31.  On or about April 5, 2022, BOJORQUEZ contacted CS-2 via phone call from the 7211 number and arranged to meet CS-2 on April 6, 2022 in Anaheim, which is in Orange County, to provide the agreed-upon samples to CS-2 for his/her associate.  This phone call was recorded and is preserved.  In subsequent

communications, the meeting between BOJORQUEZ and CS-2 was
pushed to April 7, 2022.

> **E.    BOJORQUEZ Provides CS-2 With Sample Of Narcotics For
> Sale On April 7, 2022**

32. On or about the afternoon of April 7, 2022, BOJORQUEZ
sent a text message in Spanish to CS-2 asking to let him know
when he/she would be leaving his/her job so that they could meet
in the evening.

33. At the direction of DEA, CS-2 sent a text message to
BOJORQUEZ to meet at a Starbucks located at 1200 S Harbor Blvd,
Anaheim, California, and BOJORQUEZ responded "ok."

34. After CS-2 arrived at the meeting location,
surveilling law enforcement observed an individual who was
identifiable as BOJORQUEZ (based on prior photo identification)
arrive alone in a silver 2016 Nissan Sentra with California
license plate 8PYA573, park the car, get out of the car, enter
the Starbucks and greet CS-2.

35. According to DMV records, the registered owner of the
car driven by BOJORQUEZ is "German Gastelum" at "16607 Eureka
Ave, Paramount, California."  A search of law enforcement
databases has come back with no results, and thus this appear to
be a fictitious first name with "Gastelum," the partial last
name of BOJORQUEZ, at a fictitious address.  In my training and
experience, drug traffickers often utilize fictitious names and
addresses in order to avoid detection and identification by law
enforcement.

36. After a brief interaction in the Starbucks, BOJORQUEZ and CS-2 entered CS-2's car and began discussing narcotics, including quality and pricing. BOJORQUEZ provided CS-2 with sample quantities of a white powder, black tar like substance, and blue pills stamped with "M-30," wrapped in cellophane. During that conversation, BOJORQUEZ explicitly referenced "the black," "blues" and "fentanyl."

37. After BOJORQUEZ provided CS-2 with the drug samples and their discussion of narcotics concluded, surveilling law enforcement saw BOJORQUEZ leave the meeting location.

38. The black tar substance field tested presumptively positive for heroin. The other samples were not field tested due to associated risks of suspected presence of fentanyl. Based on my training and experience, the samples of white powder and blue pills provided by BOJORQUEZ to CS-2 share the appearance of suspected powder fentanyl and counterfeit "M30" Oxycodone pills which typically contain fentanyl.

**F. BOJORQUEZ Provides CS-2 With Two Kilograms of Suspected Heroin and 1 Kilogram Fentanyl On May 7, 2022**

39. On or about April 7, 2022, CS-2 told BOJORQUEZ that he/she has an associate who wants to purchase one kilogram of heroin. BOJORQUEZ told CS-2 that he would sell one kilogram of heroin for $14,500.

40. On the afternoon of May 7, 2022, BOJORQUEZ arrived unannounced at CS-2's place of employment. Based on my conversations with CS-2, BOJORQUEZ asked CS-2 to hold two kilograms of tar heroin and one kilogram of counterfeit

Oxycodone pills on BOJORQUEZ's behalf, while BOJORQUEZ returned
to Mexico and that BOJORQUEZ did not have the narcotics with him
at that time.  This conversation was not recorded due to the
unexpected arrival of BOJORQUEZ.

41.  I instructed CS-2 to meet with BOJORQUEZ later that
evening and to secure the narcotics.  At approximately 7:25
p.m., CS-2 arrived at the location provided to CS-2 by
BOJORQUEZ, the Days Inn motel located in Buena Park, in Orange
County.

42.  Moments later, DEA agents surveilling the meeting
observed BOJORQUEZ walk towards CS-2's vehicle and talk to CS-2
through the driver's side window.  Agents then observed
BOJORQUEZ walk back into the motel before returning with a
weighted Guess brand bag that he placed into the trunk of CS-2's
vehicle.

43.  After closing the trunk, BOJORQUEZ entered into the
passenger side of CS-2's vehicle.  Recorded audio of the
conversation between CS-2 and BOJORQUEZ revealed BOJORQUEZ again
asking for CS-2 to hold the narcotics for approximately two
weeks while he returned to Mexico and for CS-2 to provide one of
the kilograms of black tar heroin to his/her associate.

44.  After approximately ten minutes of conversation,
BOJORQUEZ left CS-2's vehicle.  Agents maintained observation of
CS-2 while CS-2 drove to a predetermined location where agents
then took custody of the Guess bag and the contents within the
bag.  Within the bag agents found three brick-like packages that
were consistent with the packaging, size, and shape of illegal

narcotics. Upon opening the packages, agents observed that two of the packages contained a brown, rock-like substance consistent with the color, texture, and consistency of black tar heroin. Each of the two packages tested presumptively positive as heroin.

45.    The third brick-like package was opened to reveal small, blue circular pills marked "M 30." The pills were sent to the Southwest Laboratory in Vista, California and were determined to be approximately 1,085 grams of a substance containing fentanyl.

### G.    CS-2 Agrees with BOJORQUEZ That CS-2's Associate Took the Residual Narcotics And Will Compensate BOJORQUEZ

46.    On or about May 13, 2022, BOJORQUEZ made a phone call to CS-2. CS-2 informed BOJORQUEZ that his number would be shared with CS-2's associate and to expect a call from that associate. CS-2 also told BOJORQUEZ that his associate took the residual narcotics and would compensate BOJORQUEZ when he returned to the United States.

### V.    TRAINING AND EXPERIENCE ON DRUG OFFENSES

47.    Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both

domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences, stash houses, and vehicles.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residences, stash houses and vehicles.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices

and in their residences, stash houses and vehicles, including in the form of calendar entries and location data.

e. Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f. Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences, stash houses, and vehicles.

g. Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence, stash houses, vehicles, or in safes. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h. It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often

prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[8]

48. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been

---

[8] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

   c. The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

  49.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data

during a search of the premises for a number of reasons,
including the following:

      a.  Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

      b.  Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

    50.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

      a.  Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a

user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress BOJORQUEZ's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of BOJORQUEZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

51.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

52.  For all the reasons described above, there is probable cause to believe that BOJORQUEZ has committed a violation of 21 U.S.C. § 841(a)(1): Distribution of a Controlled Substance.

There is also probable cause that the items to be seized described in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of violations of the Subject Offenses, will be found in a search of the locations described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 1st day of June, 2022.

THE HONORABLE KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE